IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| DELTA FUELS, INC., and | ) | |
| KNIGHT ENTERPRISES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

_____

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through its undersigned attorneys, acting at the request of the United States Coast Guard ("Coast Guard") and the United States Environmental Protection Agency ("U.S. EPA"), files this Complaint and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for civil penalties, injunctive relief, and cost recovery brought against Defendants, Delta Fuels, Inc. ("Delta") and Knight Enterprises, Inc. ("Knight"), pursuant to:  the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., as amended; the Emergency Planning and Community Right-To-Know Act of 1986 ("EPCRA"), 42 U.S.C. § 11001 et seq., and the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 et seq.

## JURISDICTION, AUTHORITY, AND VENUE

2.      This Court has jurisdiction over the subject matter of, and the parties to, this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; Section 311(b)(7)(E) and (n) of the CWA,

33 U.S.C. § 1321(b)(7)(E) and (n); Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4); and Section 1017(b) of OPA, 33 U.S.C. § 2717(b).

3.      Authority to bring this action is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519, 33 U.S.C. § 2715(c), and 33 U.S.C. § 1366.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a); Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E); Section 325(c)(4) of EPCRA, 42 U.S.C. § 11045(c)(4); and Section 1017(b) of OPA, 33 U.S.C. § 2717(b), because the events giving rise to the claims alleged herein occurred in this District, Defendants do business in this District, and Delta has its principal place of business in this District.

## DEFENDANTS

5.      Delta Fuels, Inc. is a corporation organized and existing under the laws of the State of Michigan.

6.      Knight Enterprises, Inc. is a corporation organized and existing under the laws of the State of Michigan.

7.      Delta is a wholly-owned subsidiary of Knight.

8.      Mr. Carroll Knight is the sole shareholder of Knight and the President of both Delta and Knight.

9.      At all times relevant hereto, Delta and Knight have owned and/or operated a bulk oil storage and transfer facility located at 1820 Front Street in Toledo, Lucas County, Ohio (the "Facility").

10.     Since about 1986, Delta has owned the Facility.

11.     In or about 1987, Delta and Knight began operating the Facility.

## <u>FACTS GIVING RISE TO LIABILITY</u>

12.     The Facility is a bulk storage and transfer facility for, among other things, gasoline, ethanol mixed with gasoline, and diesel fuel (collectively, "oil").

13.     At all relevant times, Defendants produced, used, transferred, distributed, or stored oil at the Facility.

14.     The Facility receives oil via pipeline and/or rail car tanks.

15.     Each of at least five (5) of the aboveground storage tanks at the Facility has a capacity of over two million gallons of oil.

16.     The Facility is located approximately 440 yards from the Maumee River.

17.     At all relevant times, Delta was an employer of one or more of the employees at the Facility.

18.     On or about November 25, 2005, an employee at the Facility, Mr. Dagen Gales, overfilled aboveground storage tank number three (3) with unleaded gasoline ("gasoline"), resulting in a spill of at least 103,000 gallons of gasoline from the tank (the "Spill").

19.     At approximately 9:10 a.m. on or about November 25, 2005, residents near the Facility complained about gasoline fumes to the City of Toledo Fire Department.

20.     The Spill contaminated the soils on, around, and beyond the Facility.

21.     The Spill flowed from and off of the Facility, onto Ohio Department of Transportation property, and into a storm sewer leading to the Maumee River.

22.     On or about November 29, 2005, approximately four (4) days after the Spill, Ohio Environmental Protection Agency ("Ohio EPA") informed U.S. EPA of a complaint of gasoline odors by workers on a Maumee River bridge and ramp construction project located near the Facility.

23.     That same day, on or about November 29, 2005, approximately four (4) days after the Spill, U.S. EPA responded to the Spill.

24.     The State of Ohio also responded to the Spill.

25.     On or about December 9, 2005, U.S. EPA issued a written Removal Administrative Order (the "Order") pursuant to CWA 311(c), 33 U.S.C. § 1321(c), to Delta, requiring it to perform certain removal actions.

26.     On or about December 11, 2005, Defendants received the Order and the Order was signed on the same day by Mr. John DiMartini, an employee of Knight.

27.     The Order became effective upon its receipt by Defendants.

28.     Defendants responded to the Spill by, among other things, retaining EQ Industrial Services ("EQ") and C&W Tank Cleaning Services ("C&W") to conduct removal actions to remove, mitigate, or prevent a discharge or substantial threat of a discharge of oil to the Maumee River and adjoining shorelines.

29.     On or before April 5, 2006, Defendants stopped performing most of the required removal actions under the Order.

30.     On or about April 5, 2006, the United States began, among other things, to conduct removal actions at or near the Facility to remove, mitigate or prevent a discharge or substantial threat of a discharge of oil to the Maumee River and adjoining shorelines.

31.     The United States has incurred and may continue to incur removal costs in connection with the removal actions.

32.     The removal costs of the United States were paid and may continue to be paid from the Oil Spill Liability Trust Fund, 33 U.S.C. § 2701(11), ("Fund"), by the United States Treasury, on behalf of the National Pollution Funds Center, which is part of the Coast Guard.

33.     The State of Ohio, EQ, and C&W each conducted removal actions to capture the oil from the Spill and incurred removal costs in connection with the removal actions.

34.     The State of Ohio, EQ, and C&W each submitted removal cost claims to the Coast Guard for reimbursement of their uncompensated removal costs from the Fund for the actions they took regarding the Spill.

35.     On or about January 10, 2007, $699,289.33 was paid from the Fund to C&W.

36.     On or about March 19, 2007, $1,618,379.90 was paid from the Fund to EQ.

37.     On or about October 26, 2007, $12,721.54 was paid from the Fund to the State of Ohio.

38.     As of October 26, 2007, the Fund had incurred removal costs of at least $4,046,337.86, specifically:

    a.     at least $1,715,947.09 for the United States,
    b.     at least $12,721.54 for State of Ohio,
    c.     at least $1,618,379.90 for EQ, and
    d.     at least $699,289.33 for C&W.

39.     On or about October 26, 2007, the Coast Guard, on behalf of the Fund, sent a bill to Delta seeking $4,033,616.22 for reimbursement of, collectively, the United States' removal costs as of October 26, 2007 and for the claims paid to EQ and C&W.

40.     As of December 7, 2009, the Fund had incurred removal costs of at least $4,144,518.38, specifically:

    a.     at least $1,814,127.61 for the United States,
    b.     at least $12,721.54 for the State of Ohio,
    c.     at least $1,618,379.90 for EQ, and
    d.     at least $699,289.33 for C&W.

41.     On or about December 7, 2009, the Coast Guard, on behalf of the Fund, sent a bill to Delta seeking $4,288,920.18, which included $144,401.80 of accrued interest, for

reimbursement of, collectively, the United States' removal costs as of December 7, 2009 and for the claims paid to the State of Ohio, EQ, and C&W.

42. Defendants have not reimbursed the Fund for its expenditures for the United States' removal costs or for the removal cost claims paid to the State of Ohio, EQ, and C&W.

43. On or about July 5, 2006, as part of the removal actions under the Order, Defendants submitted to U.S. EPA a work plan and schedule for the installation of a liner system, entitled, "Secondary Containment and Liner Installation Workplan" (hereinafter, "Workplan").

44. The Workplan was prepared by Environmental Consulting & Technology, Inc. ("ECT"), a firm that, at relevant times, sent invoices for payments to Knight and was retained by, supervised by and/or received compensation from Knight for its work at or related to the Facility.

45. On or about July 10, 2006, U.S. EPA On-Scene Coordinator ("OSC") approved the Workplan.

46. On or about July 10, 2006, the Workplan became part of the Order.

47. On or about July 10, 2006, Defendants commenced work under the Workplan through one or more contractors.

48. On or about September 29, 2006, the OSC granted Delta an extension of the original deadline of August 11, 2006 in the Workplan to October 31, 2006 to install the liner system at the Facility.

49. U.S. EPA inspected the Facility on or about December 14, 2005 (hereinafter, "2005 Inspection") and on or about March 30, 2006 (hereinafter, "2006 Inspection") to determine whether the Facility was in compliance with applicable Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

50.     At the 2005 Inspection, the inspector requested a copy of the then current Spill Prevention Control and Countermeasure Plan (a "SPCC Plan" or "Plan") for the Facility.

51.     In response to the inspector's request described in Paragraph 50, employees of Knight and Delta present at the Facility submitted to the inspector an SPCC Plan for the Facility that was prepared by a contractor, dated April 2004 and amended on August 31, 2004 (hereinafter, "2004 SPCC Plan").

52.     On or about October 17, 2007, Defendants, through a contractor, prepared an amended SPCC Plan (hereinafter "2007 SPCC Plan").

53.     The 2007 SPCC Plan is the current SPCC Plan for the Facility since the Defendants have not updated, revised, amended, or replaced it with another plan.

54.     Delta employs and has, at relevant times, employed on a full-time basis between one and three individuals at the Facility.

55.     Delta's full-time employees at the Facility have, at relevant times, held one or more of the following titles:  terminal manager, operations manager, assistant manager, and terminal operator.

56.     Terminal managers or operations managers employed at the Facility supervise and have, at relevant times, supervised other full-time employees of Delta at the Facility.

57.     Terminal managers and/or operations managers at the Facility reported to and/or were supervised by employees of Knight, including but not limited to Mr. John DiMartini and Mr. David Cacioppo.

58.     One or more of Delta's employees at the Facility reported to and/or were supervised by Mr. James Demyan, an employee of Knight or Knight's subsidiary, Delta Fuels of Michigan, Inc.

59.     At relevant times, accounting for Delta was performed by employees of Knight or contractors retained by Knight.

60.     At least until 2007, employees of Knight, including but not limited to Mr. John DiMartini and Mr. David Cacioppo, were responsible for the environmental affairs or management at or related to the Facility, including but not limited to correspondence and interactions with state and federal government agents.

61.     At least until 2007, Mr. Carroll Knight and/or employees of Knight, including but not limited to Mr. John DiMartini and Mr. David Cacioppo, selected and retained environmental and other contractors and consultants to perform work at or related to the Facility.

62.     At least until 2007, employees of Knight, including but not limited to Mr. John DiMartini and Mr. David Cacioppo, supervised and/or worked closely with the contractors and consultants described in the previous paragraph.

63.     At relevant times, employees of Knight, including but not limited to Mr. John DiMartini, handled communications with suppliers of products to the Facility.

64.     At relevant times, employees of Knight, including but not limited to Mr. John DiMartini, handled invoices for payments submitted by the Ohio EPA related to the Facility.

65.     At relevant times, employees of Knight, including but not limited to Mr. John DiMartini and Mr. David Cacioppo, ran, operated, and/or were in charge of the Facilility and day-to-day operations of the Facility.

66.     At relevant times, employees of Knight, including but not limited to Mr. John DiMartini, had authority to sign documents and enter into agreements on Delta's behalf.

67.     At relevant times, suppliers of products to the Facility sent to Knight invoices for payments related to deliveries to the Facility.

68.     At relevant times, employees of Delta, including but not limited to Mr. Dagen Gales, were paid with checks by Knight and/or were on Knight's payroll.

69.     In or around 2006, Knight filed an insurance claim related to the Spill that occurred at the Facility.

70.     At relevant times, wire transfers to or from Delta were initiated and/or authorized by employees of Knight, including but not limited to Ms. Shirley Trombetta.

71.     At relevant times, employees of Knight and/or Delta Fuels of Michigan, Inc., including but not limited to Mr. James Demyan and Mr. John DiMartini, participated in the hiring and firing of Delta's employees.

72.     At least until 2007, Delta did not maintain financial paperwork related to the operations at the Facility, including but not limited to purchase orders and/or delivery confirmations.

73.     At least until 2007, Delta did not maintain records related to inspections at the Facility, employee training and contractors or consultants that performed work at or related to the Facility, including but not limited to Consolidated Environmental Services ("CES").

74.     At least until 2007, corporate records related to the Facility and Delta, including but not limited to employment, accounting and inventory records, were maintained by employees of Knight at Knight's offices.

75.     At relevant times, employees of Knight controlled and managed the Facility's operations and business affairs.

76.     On one or more occasions, Knight has held itself out as liable for the Facility's obligations.

## LEGAL FRAMEWORK

## CLEAN WATER ACT ("CWA")

77.     Section 311(c)(1) of the CWA, 33 U.S.C. § 1321(c)(1), authorizes the President of the United States ("The President") to ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance into or on the navigable waters or the adjoining shorelines of the navigable waters.  Section 311(c)(1) of the CWA, 33 U.S.C. § 1321(c)(1), further authorizes the President to direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge.

78.     Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1), authorizes the President to issue regulations, among other things, establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil from onshore facilities, and to contain such discharges.

79.     Through Section (a) of Executive Order 12,777, the President delegated the authority under Section 311(c) of the CWA, 33 U.S.C. § 1321(c), to the U.S. EPA and the Coast Guard; and delegated the authority under Section 311(j) of the CWA, 33 U.S.C. § 1321(j), to U.S. EPA for non-transportation-related onshore facilities, Exec. Order No. 12,777 § (a), 56 Fed. Reg. 54,757 (Oct. 18, 1991).

80.     Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), defines "oil" as "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."

81.     Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2), defines "discharge" as including but "not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, or dumping . . . ."

82.     Section 311(a)(6)(B) of the CWA, 33 U.S.C. § 1321(a)(6)(B), defines "owner or operator" in the case of an onshore facility as "any person owning or operating such onshore facility . . . ."

83.     Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7), defines "person" to include "an individual, firm, corporation, association, [or] a partnership."

84.     Section 311(a)(8) of the CWA, 33 U.S.C. § 1321(a)(8), defines "remove" or "removal" as the "containment and removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."

85.     Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), defines "onshore facility" as "any facility . . . of any kind located in, on, or under, any land within the United States other than submerged land."

86.     Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

87.     Pursuant to its authority under CWA Section 311(j)(1)(C), 33 U.S.C. § 1321(j)(1)(C), and Executive Order 12,777, U.S. EPA promulgated 40 C.F.R. Part 112 (hereinafter, "Oil Pollution Prevention Regulations"), which establishes, among other things, procedures, methods, equipment, and other requirements to prevent the discharge of oil from

non-transportation-related onshore facilities into or upon the navigable waters of the United

States or adjoining shorelines, as provided in 40 C.F.R. § 112.1(a)(1).

88.     The Oil Pollution Prevention Regulations at 40 C.F.R. Part 112 apply to, among

other things, any owner or operator of a non-transportation-related onshore facility:

a.     engaged in, among other things, drilling, producing, gathering, storing,

processing, refining, transferring, distributing, using, or consuming oil and oil products, which,

due to its location, could reasonably be expected to discharge oil in quantities that may be

harmful, as described in 40 C.F.R Part 110, into or upon the navigable waters of the United

States or adjoining shorelines, and

b.     that has oil in certain types of tanks or containers, including, among other things,

any aboveground container, any completely buried tank, any container used for standby,

seasonal, or temporary storage, or any bunkered tank or partially buried tank as described

therein.  40 C.F.R. § 112.1

89.     As provided in Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4), and in 40

C.F.R. § 110.3, those discharges of oil in such quantities that may be harmful to the public health

or welfare or the environment of the United States include discharges of oil that:  (a) violate

applicable water quality standards, or (b) cause a film or sheen upon or discoloration of the

surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited

beneath the surface of the water or upon adjoining shorelines.

90.      A "non-transportation-related" facility is defined to include:  oil storage facilities

including all equipment and appurtenances related thereto, as well as fixed bulk plant storage,

terminal oil storage facilities, consumer storage, pumps and drainage systems used in the storage

of oil, but excluding in-line or breakout storage tanks needed for the continuous operation of a

pipeline system and any terminal facility, unit or process integrally associated with the handling or transferring of oil in bulk to or from a vessel, as set forth in the "Memorandum of Understanding Between the Environmental Protection Agency and the Department of Transportation," 36 Fed. Reg. 24,080 (Dec. 18, 1971), incorporated by reference by 40 C.F.R. § 112.2, and set forth in 40 C.F.R. Part 112, Appendix A.

91.     40 C.F.R. Part 112.3 requires the owner or operator of an onshore facility that was in operation on or before August 16, 2002 to have prepared a Spill Prevention, Control, and Countermeasures Plan ("SPCC Plan" or "Plan"), in writing, and in accordance with 40 C.F.R. § 112.7 and any other applicable section of 40 C.F.R. Part 112, and to maintain the Plan in accordance with 40 C.F.R. Part 112.

92.     40 C.F.R. § 112.3(d) requires a licensed Professional Engineer to review and certify a Plan for it to be effective to satisfy the requirements of 40 C.F.R. Part 112.

93.     40 C.F.R. § 112.7 requires the owner or operator of a facility subject to 40 C.F.R. Part 112 to prepare a Plan in accordance with good engineering practices.

94.     40 C.F.R. § 112.7 requires the SPCC Plan to have the full approval of management at a level of authority to commit the necessary resources to fully implement the SPCC Plan.

95.     40 C.F.R. § 112.7(a) requires the owner or operator of a facility subject to 40 C.F.R. Part 112 to include a discussion in the Plan of the facility's conformance with the requirements in 40 C.F.R. Part 112 and to comply with all applicable requirements listed in 40 C.F.R. Part 112.

96.     40 C.F.R. § 112.7(c) requires the owner or operator of a facility subject to 40 C.F.R. Part 112 to provide appropriate containment and/or diversionary structures or equipment as set forth therein.

97.     40 C.F.R. § 112.8(a) requires the owner or operator of a facility subject to 40 C.F.R. Part 112 to meet the general requirements for the Plan in 40 C.F.R. § 112.7 and the specific discharge prevention and containment procedures listed in 40 C.F.R. § 112.8.

98.     40 C.F.R. § 112.8 requires the owner or operator of a facility subject to 40 C.F.R. Part 112 to, among other things, restrain drainage from diked storage areas, provide a secondary means of containment for bulk storage container installations for the entire capacity of the largest single container and sufficient freeboard to contain precipitation, and ensure that diked areas are sufficiently impervious to contain discharged oil.

99.     Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of [Section 311] shall be subject to a civil penalty in an amount up to $25,000 per day of violation." This civil penalty amount has been adjusted under the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and U.S. EPA regulations codified at 40 C.F.R. Part 19, which provide that penalties of up to $27,500 per day may be assessed for each violation occurring on or after January 31, 1997, and on or before March 15, 2004; up to $32,500 per day may be assessed for each violation occurring after March 15, 2004, through January 12, 2009; and up to $37,500 per day may be assessed for each violation occurring after January 12, 2009.   See 73 Fed. Reg. 75,340 (Dec. 11, 2008).

## EMERGENCY PLANNING and COMMUNITY RIGHT-TO-KNOW ACT ("EPCRA")

100.    Pursuant to 42 U.S.C. § 11001 et seq., EPCRA requires that, among other things, each State establish a State emergency response commission (hereinafter, "SERC") and local emergency planning committees (hereinafter, "LEPC"), and requires industrial and commercial facilities handling hazardous chemicals to adhere to a system of notification requirements.

101.    Section 312(a)(1) of EPCRA, 42 U.S.C. § 11022(a)(1), and its implementing regulations at 40 C.F.R. Part 370, requires the owner or operator of any "facility" which is required to prepare or have available a material safety data sheet ("MSDS") for a "hazardous chemical" under the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 et seq., and regulations promulgated under OSHA, to prepare and submit emergency and hazardous chemical inventory forms (Tier I or Tier II, as described in 40 C.F.R. Part 370) containing the information required by those sections to the appropriate LEPC, SERC, and the fire department with jurisdiction over the facility.

102.    The inventory forms described in Paragraph 101 must be submitted annually on or before March 1 and must contain data with respect to the preceding calendar year pursuant to Section 312(a)(2) of EPCRA, 42 U.S.C. § 11022(a)(2).

103.    Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), defines "facility" as "all buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person . . . ."

104.    Under Section 329(7) of EPCRA, 42 U.S.C. § 11049(7), a "person" is defined as "any individual, trust, firm, joint stock company, [or] corporation . . . ."

105.    Pursuant to Sections 6 and 8 of OSHA, 29 U.S.C. §§ 655 and 657, the United States Department of Labor promulgated 29 C.F.R. § 1910.1200(b), which requires all "employers" to "provide information" and to "maintain copies of any material safety data sheets" regarding "the hazardous chemicals" to which their employees are exposed regarding "any chemical which is known to be present in the workplace in such a manner that employees may be exposed under normal conditions of use or in a foreseeable emergency."

106.    29 C.F.R. § 1910.1200(c) defines an "employer" as "a person engaged in a business where chemicals are either used, distributed, or are produced for use or distribution . . ."

107.    A "hazardous chemical" is defined as "any chemical which is a physical hazard or a health hazard" in 29 C.F.R. § 1910.1200(c) and 40 C.F.R. § 370.66.

108.    Pursuant to 29 C.F.R. § 1910.1200(c), a "physical hazard" is "a chemical for which there is scientifically valid evidence" that it is a "combustible liquid" or "explosive" or "flammable."

109.    40 C.F.R. § 370.10(a)(2)(i) sets the minimum threshold level at 10,000 pounds for reporting for certain hazardous chemicals, which include gasoline, ethanol mixed with gasoline, and diesel fuel oil stored at a bulk terminal facility.

110.    Under Section 325(c)(3) of EPCRA, 42 U.S.C. § 11045(c)(3), each day a violation described in 42 U.S.C. § 11045(c)(1) or (2) continues constitutes a separate violation of EPCRA.

111.    Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), provides that "any person . . . who violates any requirement of section 11022 . . . shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation."  This civil penalty amount has been adjusted under the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461, as amended by 31 U.S.C. § 3701, and U.S. EPA regulations codified at 40 C.F.R. Part

19, which provide that penalties of up to $27,500 per day may be assessed for each violation

occurring on or after January 31, 1997, and on or before March 15, 2004; up to $32,500 per day

may be assessed for each violation occurring after March 15, 2004, through January 12, 2009;

and up to $37,500 per day may be assessed for each violation occurring after January 12, 2009.

See 73 Fed. Reg. 75,340 (Dec. 11, 2008).

## OIL POLLUTION ACT ("OPA")

112.     Section 1002 of OPA, 33 U.S.C. § 2702, provides:

(a) Notwithstanding any other provision or rule of law . . . each responsible party for . . . a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident.

(b)(1)The removal costs referred to in subsection (a) of this section are—

(A) all removal costs incurred by the United States [or] a State. . . under subsection (c), (d), (e), or (l) of section 1321 of this title . . . or under State law; and

(B) any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan.

113.     Section 1001(3) of OPA, 33 U.S.C. § 2701(3), defines "claim" to include "a

request, made in writing for a sum certain, for compensation for damages or removal costs

resulting from an incident."

114.     Section 1001(4) of OPA, 33 U.S.C. § 2701(4), defines "claimant" to include "any

person or government who presents a claim for compensation under [subchapter I of OPA]."

115.     Section 1001(7) of OPA, 33 U.S.C. § 2701(7), defines "discharge" to include

"any emission (other than natural seepage), intentional or unintentional, and includes, but is not

limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

116.     Section 1001(21) of OPA, 33 U.S.C. § 2701(21), defines "navigable waters" to include "the waters of the United States, including the territorial sea."

117.     Section 1001(23) of OPA, 33 U.S.C. § 2701(23), defines "oil" to include "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil . . . ."

118.     Section 1001(26)(A)(ii) of OPA, 33 U.S.C. § 2701(26)(A)(ii), defines "owner or operator" to include "in the case of an onshore or offshore facility, any person owning or operating such facility."

119.     Section 1001(27) of OPA, 33 U.S.C. § 2701(27), defines "person" to include "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

120.     Section 1001(31) of OPA, 33 U.S.C. § 2701(31), defines "removal costs" to include "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident."

121.     Federal removal actions may be funded through the Oil Spill Liability Trust Fund ("Fund"), which is administered by the Coast Guard.  See Sections 1001(11) and 1012(a) of OPA, 33 U.S.C. §§ 2701(11) and 2712(a).

122.     Pursuant to Sections 1012(a)(1) and (4) of OPA, 33 U.S.C. §§ 2712(a)(1) and (4), the Fund can be used for, among other things, the payment of federal and state removal costs and certain non-governmental claims against the Fund.

123.     Pursuant to Sections 1012(f) and 1015(a) of OPA, 33 U.S.C. §§ 2712(f) and 2715(a), when the Fund pays any claim for removal costs or damages, it is subrogated to all

rights, claims, and causes of action that the claimant has under any law, including the right under OPA to recover such costs and damages from a responsible party.

124. In the case of a pollution incident involving an onshore facility, Section 1001 (32)(B) of OPA, 33 U.S.C. § 2701(32)(B), defines a "responsible party" to include any person owning or operating the facility, and Section 1001(9) of OPA, 33 U.S.C. § 2701(9), defines "facility" to include "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil."

125. Section 1015(c) of OPA, 33 U.S.C. § 2715(c), authorizes the Attorney General to commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to OPA, and all costs incurred by the Fund by reason of the claim, including interest (including prejudgment interest), administrative and adjudicative costs, and attorney's fees.

## GENERAL ALLEGATIONS

126. Both Delta and Knight, as corporations, are "persons" within the meaning of Section 311(a)(7) of the CWA, 33 U.S.C. § 1321(a)(7), Section 329(7) of EPCRA, 42 U.S.C. § 11049(7), and Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

127. At all times relevant, Delta is and was an "owner" or "operator" of the Facility within the meaning of Section 311(a)(6)(B) of the CWA, 33 U.S.C. § 1321(a)(6)(B), Section 312(a)(1) of EPCRA, 42 U.S.C. S 11022(a)(1), and Sections 1001(26)(A)(ii) and (27) of OPA, 33 U.S.C. §§ 2701(26)(A)(ii) and (27).

128. At all relevant times, Knight is and was an "operator" of the Facility within the meaning of Section 311(a)(6)(B) of the CWA, 33 U.S.C. § 1321(a)(6)(B), Section 312(a)(1) of

EPCRA, 42 U.S.C. S 11022(a)(1), and Sections 1001(26)(A)(ii) and (27) of OPA, 33 U.S.C. §§ 2701(26)(A)(ii) and (27).

129.    The Facility is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2, a "facility" within the meanings of Section 312(a)(1) of EPCRA, 42 U.S.C. S 11022, and a "facility" within the meaning of Section 1001(9) of OPA, 33 U.S.C. § 2701(9).

130.    The Facility has an aggregate aboveground storage capacity of over eleven (11) million gallons of "oil" as that term is defined in Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

131.    The gasoline discharged in the Spill was "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and Section 1001(23) of OPA, 33 U.S.C. § 2701(23).

132.    The Maumee River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and Section 1001(21) of OPA, 33 U.S.C. § 2701(21).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Failure to Comply with an Order Issued Under CWA § 311(c))

133.    The United States refers to and incorporates by reference, as though fully set forth herein, each and every paragraph of the Complaint.

134.    The Spill that occurred on or about November 25, 2005 presented, and may continue to present, a substantial threat of a discharge of oil into or on navigable waters, specifically the Maumee River and adjoining shorelines.

135.    Once U.S. EPA approved the Workplan on or about July 10, 2006, the Workplan and schedule became an enforceable part of the Order.

136.    The Workplan is enforceable such that a failure to comply with the Workplan constitutes a failure to comply with the Order.

137.    U.S. EPA issued its Order pursuant to Section 311(c) of the CWA, 33 U.S.C. § 1321(c), and Defendants committed the following violations of the Order and/or the Workplan by:

a.    failing to provide to U.S. EPA, pursuant to Paragraph 21 of the Order, any of the written progress reports which were required to include, among other things, all analytical data relating to removal actions, and were due every thirty business days after July 10, 2006 (the date on which U.S. EPA approved the Workplan) and continuing to the present;

b.    failing to provide reports to U.S. EPA, pursuant to the Workplan, that, among other things, were to summarize and document the requisite impermeability and integrity of the liner that Defendants installed for secondary containment purposes to prevent potential future spills from impacting any off site receptors and to prevent any existing contamination at the Facility from further impacting off site areas; and

c.    upon information and belief, failing to complete tasks relating to Defendants' installation of the liner system as set forth in the Workplan, including, but not limited to, failing to:

i.    document soil excavation and liner placement activities;

ii.    provide soil sampling results from, among other places, the clay plug area;

iii.    document required geotechnical evaluations to verify compaction and permeability characteristics of compacted clay around the pipelines at the Delta Facility;

iv.    create updated site maps depicting the specific locations of the liner system and bermed areas; and

v.    provide to U.S. EPA a report consisting of an evaluation of the laboratory results of the soil excavation area and a comprehensive description of activities conducted under the Workplan.

138.    Unless this Court grants injunctive relief, Defendants will continue to violate the CWA by continuing to violate the Order and/or the Workplan.

### SECOND CLAIM FOR RELIEF

**(Failure to Comply with Oil Pollution Prevention Regulations)**

139.    The United States refers to and incorporates by reference, as though fully set forth herein, each and every paragraph of the Complaint.

140.    The gasoline, ethanol, and diesel fuel that Defendants store at the Facility each are "oil" as defined in Section 311 (a)(1) of the CWA, 33 U.S.C. § 1321(a)(1).

141.    The Facility is a non-transportation-related onshore facility engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing, using, or consuming oil and oil products, which, due to its location of approximately 440 yards from the Maumee River, could reasonably be expected to discharge oil in quantities that may be harmful, as described in 40 C.F.R. Part 110, into or upon the navigable waters of the United States or adjoining shorelines, specifically the Maumee River and adjoining shorelines.

142.    The Facility is subject to the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

### 2004 SPCC Plan

143.    Defendants failed to maintain an SPCC Plan in accordance with 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3; failed to prepare an SPCC Plan in accordance with good engineering practices, as required by 40 C.F.R. § 112.7; and failed to include a complete discussion of the Facility's conformance with the requirements of 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.7(a)(1), because the 2004 SPCC Plan did not include certain requirements of 40 C.F.R. Part 112, such as:

a.      the 2004 SPCC Plan failed to adequately and accurately discuss provisions for containment as required by 40 C.F.R. §§ 112.7 and 112.8, including:  1) appropriate containment and/or diversionary structures or equipment to prevent a discharge from the Facility; and, 2) secondary containment for its bulk storage tanks that was sufficiently impervious to contain discharged oil;

b.      the 2004 SPCC Plan failed to include integrity testing for its containers or tanks, as required by 40 C.F.R. § 112.8(c)(6);

c.      the 2004 SPCC Plan failed to include certification from a licensed Professional Engineer, as required by 40 C.F.R. § 112.3(d);

d.      upon information and belief, the 2004 SPCC Plan failed to have the full approval of management at a level of authority to commit the necessary resources to fully implement the Plan, as required by 40 C.F.R. § 112.7; and

e.      the 2004 SPCC Plan failed to adequately discuss a system to prevent the overfilling of bulk storage tanks, as required by 40 C.F.R. § 112.8(c)(8).

**2007 SPCC Plan**

144.    Defendants failed to maintain an SPCC Plan in accordance with 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3; failed to prepare an SPCC Plan in accordance with good engineering practices, as required by 40 C.F.R. § 112.7; and failed to include a complete discussion of the Facility's conformance with the requirements of 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.7(a)(1), because the 2007 SPCC Plan did not include certain requirements of 40 C.F.R. Part 112, such as:

a.      the 2007 SPCC Plan failed to adequately and accurately discuss provisions for appropriate containment and/or diversionary structures or equipment to prevent a discharge from the Facility, as required by 40 C.F.R. § 112.7(c);

b.      the 2007 SPCC Plan failed to include training of its oil handling personnel in all required areas, as required by 40 C.F.R. §§ 112.7(f)(1) and (f)(3);

c.      the 2007 SPCC Plan failed to provide that records must be kept of drainage of uncontaminated rainwater and the procedures for such drainage, as required by 40 C.F.R. § 112.8(c)(3);

d.      the 2007 SPCC Plan failed to provide that the effluent treatment facilities must be observed frequently to detect system upsets that could cause a discharge of oil, as required by 40 C.F.R. §        112.8(c)(9); and

e.      the 2007 SPCC Plan failed to address removal of oil accumulations from diked areas, as required by 40 C.F.R. § 112.8(c)(10).

**Implementation Violations**

145.    Defendants failed to comply with the provisions of 40 C.F.R. Part 112, because

Defendants:

a.      with respect to containment

i.      failed to maintain their 2004 SPCC Plan in accordance with 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3, by not implementing provisions in its 2004 SPCC Plan regarding secondary containment for its bulk storage tanks;

ii.      at the Facility, failed to implement the provisions of 40 C.F.R.  §§ 112.7 and 112.8, which require Defendants to provide secondary containment for its bulk tanks that was sufficiently impervious to contain discharged oil; and

iii.      at the Facility, failed to implement the provisions of 40 C.F.R.  §§ 112.7 and 112.8, which require Defendants to provide appropriate containment and/or diversionary structures or equipment to prevent a discharge.

b.      failed to maintain their 2004 SPCC Plan in accordance with 40 C.F.R. Part 112, as required by 40 C.F.R. Section 112.3, by not implementing provisions in the 2004 SPCC Plan that require training of each of its oil handling personnel.

c.      with respect to overflow prevention

i.      failed to maintain their 2004 SPCC Plan in accordance with 40 C.F.R. Part 112, as required by 40 C.F.R. § 112.3, by not implementing provisions in its 2004 SPCC Plan that require product levels in bulk storage tanks to be observed during transfer operations, and

ii.      at the Facility, failed to implement the provisions of 40 C.F.R. § 112.8(c)(8), which require Defendants to provide a high liquid level alarm or other specified system to prevent overfilling of bulk storage tanks.

146.    Unless this Court grants injunctive relief, Defendants will continue to violate the

regulations at 40 C.F.R. Part 112.

147.    Each failure to maintain the 2004 SPCC Plan in accordance with 40 C.F.R. Part 112, each failure to maintain the 2007 SPCC Plan in accordance with 40 C.F.R. Part 112, and each failure to comply with each other provision of 40 C.F.R. Part 112 is a separate violation of a regulation issued under CWA Section 311(j), 33 U.S.C. § 1321(j).

148.    As a result, Defendants are subject to civil penalties up to $32,500 per day for each violation that occurred after March 15, 2004 through January 12, 2009, inclusive, and up to $37,500 per day for each violation that occurred after January 12, 2009, pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and under the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and U.S. EPA regulations codified at 40 C.F.R. Part 19.

## THIRD CLAIM FOR RELIEF

### (Failure to Make Timely EPCRA § 312 Notifications)

149.    The United States refers to and incorporates by reference, as though fully set forth herein, each and every paragraph of the Complaint.

150.    Defendants were required to maintain copies of any material safety data sheets ("MSDSs") regarding "the hazardous chemicals" to which the employee(s) at the Facility were exposed, pursuant to 29 C.F.R. § 1910.1200(g)(8).

151.    Gasoline, ethanol mixed with gasoline, and diesel fuel oil are "hazardous chemicals" within the meaning of Section 311(e) of EPCRA, 42 U.S.C. § 11021(e), and 29 C.F.R. § 1910.1200(c), and 40 C.F.R. § 370.66.

152.    Gasoline, ethanol mixed with gasoline, and diesel fuel oil are "hazardous chemicals" because they are "physical hazards" within the meaning of 29 C.F.R. § 1910.1200(c) and 40 C.F.R. § 370.66.

153.    Gasoline, ethanol mixed with gasoline, and diesel fuel oil are "physical hazards" because they are "combustible liquids" or "flammable" within the meaning of 29 C.F.R. § 1910.1200(c) due to their flash points.

154.    During at least one period of time in each of the calendar years 2003, 2004, 2006 and 2007, gasoline, ethanol mixed with gasoline, and/or diesel fuel oil were each present at the Facility in an amount equal to or greater than the minimum threshold level described at Paragraph 109.

155.    Covering the 2003 calendar year, Defendants, as the owners and/or operators of the Facility, were required to submit on or before March 1, 2004 to the SERC and the fire department with jurisdiction over the Facility a completed emergency and hazardous chemical inventory form regarding gasoline, ethanol mixed with gasoline, and/or diesel fuel oil, as required by Section 312 of EPCRA, 42 U.S.C. § 11022.

156.    Covering the 2004 calendar year, Defendants, as the owners and/or operators of the Facility, were required to submit on or before March 1, 2005 to the SERC and the fire department with jurisdiction over the Facility a completed emergency and hazardous chemical inventory form regarding gasoline, ethanol mixed with gasoline, and/or diesel fuel oil, as required by Section 312 of EPCRA, 42 U.S.C. § 11022.

157.    Covering the 2006 calendar year, Defendants, as the owners and/or operators of the Facility, were required to submit on or before March 1, 2007 to the SERC and the fire department with jurisdiction over the Facility a completed emergency and hazardous chemical inventory form regarding gasoline, ethanol mixed with gasoline, and/or diesel fuel oil, as required by Section 312 of EPCRA, 42 U.S.C. § 11022.

158.     Covering the 2007 calendar year, Defendants, as the owners and/or operators of the Facility, were required to submit on or before March 1, 2008 to the SERC and the fire department with jurisdiction over the Facility a completed emergency and hazardous chemical inventory form regarding gasoline, ethanol mixed with gasoline, and/or diesel fuel oil, as required by Section 312 of EPCRA, 42 U.S.C. § 11022.

159.     Defendants committed the following violations of Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), each of which is a separate violation of EPCRA, by failing to prepare and timely submit an annual emergency and hazardous chemical inventory form to the appropriate:

a.     SERC for the 2003 calendar year by the March 1, 2004 deadline;
b.     fire department for the 2003 calendar year by the March 1, 2004 deadline;
c.     SERC for the 2004 calendar year by the March 1, 2005 deadline;
d.     fire department for the 2004 calendar year by the March 1, 2005 deadline.
e.     SERC for the 2006 calendar year by the March 1, 2007 deadline;
f.     fire department for the 2006 calendar year by the March 1, 2007 deadline;
g.     SERC for the 2007 calendar year by the March 1, 2008 deadline; and
h.     fire department for the 2007 calendar year by the March 1, 2008 deadline.

160.     Defendants submitted the overdue 2003 and 2004 annual emergency and hazardous chemical inventory forms described in Paragraph 159 to the appropriate SERC and fire department on or about December 28, 2005.

161.     Defendants submitted the overdue 2006 annual emergency and hazardous chemical inventory forms described in Paragraph 159 to the appropriate SERC and fire department on or about June 12, 2007.

162.     Defendants submitted the overdue 2007 annual emergency and hazardous chemical inventory forms described in Paragraph 159 to the appropriate SERC and fire department on or about February 27, 2009.

163.     Each day of Defendants' failure to timely comply with Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), as described in Paragraphs 159-162, is a separate violation of Section 312(a) of EPCRA, 42 U.S.C. § 11022(a), pursuant to Section 325(c)(3) of EPCRA, 42 U.S.C. § 11045(c)(3).

164.     As a result, Defendants are subject to civil penalties up to $27,500 per day for each violation that occurred on or after January 31, 1997, and on or before March 15, 2004; and up to $32,500 per day for each violation that occurred after March 15, 2004 through January 12, 2009, inclusive, pursuant to Section 325(c) of EPCRA, 42 U.S.C. § 11045(c), and under the Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and U.S. EPA regulations codified at 40 C.F.R. Part 19.

## FOURTH CLAIM FOR RELIEF

### (Cost Recovery on Behalf of the Fund)

165.     The United States refers to and incorporates by reference, as though fully set forth herein, each and every paragraph of the Complaint.

166.     Pursuant to Section 1002(a) of OPA, 33 U.S.C. § 2702(a), each responsible party for a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines is liable to the United States for its removal costs, claims, damages, and/or disbursements as specified under OPA.

167.     Each Defendant is a "responsible party" under Section 1001(32)(B) of OPA, 33 U.S.C. § 2701(32)(B).

168.     As a result of the Spill, the Fund has incurred, and may continue to incur, removal costs and claims.

169.    Defendants are liable to the United States for all removal costs, claims, and

disbursements, which as of December 7, 2009, are at least $4,144,518.38, plus interest, including

prejudgment interest, administrative and adjudicative costs, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States, respectfully requests that this Court:

a.      Assess civil penalties against Defendants Delta Fuels, Inc. and Knight
Enterprises, Inc.;

b.      Order Defendants Delta Fuels, Inc. and Knight Enterprises, Inc. promptly to take
all steps necessary or appropriate to comply with the foregoing laws and regulations, to prevent
future violations of such laws and regulations, and to protect the waters of the United States;

c.      Enter a judgment against Defendants Delta Fuels, Inc. and Knight Enterprises,
Inc. for all removal costs, claims, and disbursements incurred in responding to Delta's Spill, plus
interest, including prejudgment interest, administrative and adjudicative costs, and attorney's
fees;

d.      To the extent that Defendant Delta Fuels, Inc. cannot satisfy its debts and
obligations to the United States, in addition to holding Defendant Knight Enterprises, Inc. liable
as an operator of the Facility for the requested relief listed above, pierce the corporate veil to
hold Defendant Knight Enterprises, Inc. liable for all debts and obligations of its subsidiary
Defendant Delta Fuels, Inc.

e.      Grant the United States such other relief as this Court deems just and proper.


Respectfully submitted,


IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice



Page **29** of **30**

Signature Page for Complaint in *United States v. Delta Fuels, Inc. and Knight Enterprises, Inc.*
(N.D. Ohio)

s/ Iva Ziza_____

IVA ZIZA
ALISON MCGREGOR
Trial Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611
Phone:  (202) 514-3211
Fax:  (202) 514-8395
iva.ziza@usdoj.gov

STEVEN M. DETTELBACH
United States Attorney
Northern District of Ohio

s/ Steven J. Paffilas_____

STEVEN J. PAFFILAS (0037376)
Assistant United States Attorney
Northern District of Ohio
801 W. Superior Avenue
Suite 400
Cleveland, OH 44113
Phone:  (216) 622-3698
Fax:  (216) 522-4982
steven.paffilas@usdoj.gov

OF COUNSEL:

Thomas Krueger
Office of Regional Counsel
U.S. EPA Region 5
77 West Jackson Blvd.
Chicago, IL 60604

LCDR Donna Leoce
U.S. Coast Guard
National Pollution Funds Center
4200 Wilson Blvd., Suite 1016
Arlington, VA 20598-7100